Max E. Riley and Sara Jean Riley v. Commissioner.
Riley v. Commissioner
Docket No. 6337-65.
United States Tax Court
T.C. Memo 1967-88; 1967 Tax Ct. Memo LEXIS 171; 26 T.C.M. (CCH) 436; T.C.M. (RIA) 67088; April 25, 1967
Max E. Riley, pro se, 1006 Venice Dr., Silver Spring, Md. Herbert A. Seidman, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in petitioners' income tax liability for the years 1961 and 1963 in the amounts of $300 and $220, respectively. That part of the deficiency determined for 1961 which is herein at issue resulted from respondent's disallowance of a deduction of $1,000 of a net long-term capital loss of $4,158.33, claimed on their amended return for that year by petitioners on account of the sale for $500 of "office furn & fixtures recv'd in partnership liquidation" in July 1961, [1] recited as having been acquired "3/24/58 5/7/58." Respondent determined that the $500 constituted additional income reciting in his "Explanation of Adjustments" that his determination *172 was "based on [petitioners'] failure to substantiate the cost or other basis of the property sold in 1961 in an amount in excess of [their] proceeds from [the] sale of such property in the prior year." The deficiency determined for 1963 resulted from respondent's disallowance of a loss of $1,000 claimed by petitioners in their amended return for that year an account of "Personal Loan" and the disallowance of a capital loss carryover claimed by petitioners on account of the sale of the property reported in their 1961 return. Thus, the issues presented herein are: (1) whether petitioners sustained a long-term capital loss in 1961 and, if so, the amount thereof, and (2) whether petitioners sustained a nonbusiness bad debt loss in 1963 and, if so, the amount thereof. Findings of Fact Petitioners are husband and wife who live in Silver Spring, Maryland, and filed their original and amended income tax returns for the years 1961 and 1963 with the district director of internal revenue at Baltimore, Maryland. Max E. Riley will be referred to hereinafter as the "petitioner." For some years prior to 1958, petitioner, who *173 was a petroleum engineer, practiced his profession and resided in Venezuela. In 1958 petitioner returned to this country and settled in Oklahoma where he first lived in Oklahoma City. Upon meeting John T. Rowlett, who was a petroleum engineer with a residence and office in Shawnee, Oklahoma, petitioner and Rowlett, in March 1958, entered into an informal oral partnership agreement purporting to form a partnership engaged in providing engineering and management services to persons in the petroleum industry. Rowlett had in his office furniture and equipment costing a little over $5,000. It was petitioner's original view that the partnership agreement only required him to contribute $2,500 to the capital of the partnership. However, Rowlett convinced petitioner that the agreement was that petitioner was to pay Rowlett $2,500 for a half interest in the furniture and equipment, that the furniture and equipment was then to constitute part of the capital of the partnership, that Rowlett was to contribute this $2,500 payment, and petitioner was to contribute another $2,500 to be used as working capital of the partnership. Petitioner paid Rowlett the sum of $1,000 by a check dated March 23, 1958, the *174 sum of $1,000 by a check dated April 10, 1958, and the sum of $500 by a check dated April 18, 1958. On the face of the latter check was [were] written the words "Final payment of $2,500 for office furniture." On March 24, 1958, a notation was made on the books of Rowlett & Riley showing "Transfer of office furniture and fixtures to partnership account Rowlett & Riley 50/50." On April 18, 1958, petitioner drew a check on his personal bank account in the amount of $250, payable to Rowlett with the notation thereon "Establish jt acct. Rowlett & Riley" which was endorsed by Rowlett "for Rowlett & Riley" and was the first deposit made in the bank account of Rowlett & Riley. No other deposits were made in that account during April. As of April 30, 1958, the balance in that account was $60.59. On May 2, 1958, petitioner drew another check on his personal bank account in the sum of $500, payable to Rowlett & Riley which was deposited in the bank account of the partnership. On April 10, 1958, petitioner drew a "customer's draft" on his personal bank account in Citizens State Bank of Oklahoma City, payable to Kenneth E. Bovee Company in the amount of $1,000. This draft was drawn by petitioner *175 at the request of Rowlett. The payee thereof was not a creditor of the partnership. Early in May 1958, petitioner discovered that Rowlett was using the $2,500 payments made to him by petitioner on account of the furniture and equipment for his personal living expenses and had not made and could not make contributions therefrom to the working capital of the partnership. Petitioner had discovered shortly before from mutual acquaintances that Rowlett was indebted to such mutual acquaintances. There was "a little bit of ill feeling," and petitioner and Rowlett agreed to dissolve the partnership. According to the dissolution agreement, which was also oral and informal, petitioner was to have the full ownership of the furniture and equipment, and Rowlett was to have any cash remaining in the partnership bank account. On May 7, 1958, Rowlett signed and delivered to petitioner the following Bill of Sale: TO WHOM IT MAY CONCERN: This is to certify that on this date I have received the final payment of a series of payments totaling $3500.00, cash in hand, for which I hereby sell and assign all right and title to the following office furniture and fixtures located at 211 Masonic Building, *176 Shawnee, Oklahoma, to Mr. Max E. Riley, of Oklahoma City: Large executive desk, with matching telephone cabinet and bookcase. Secretary desk. Secretary posture chair. Executive posture chair. Executive arm chair. Three small arm chairs. Floor fan. Frigidaire air conditioner, one ton size. Three metal filing cabinets. Two floor chair pads. Two desk pads. Cotton carpet, with double pad. Drapes. Pencil sharpener. Two wastepaper baskets. Two desk ash trays. One floor style ashtray. One IBM typewriter. One Sundstrand printing calculator. Maps. One Remington copy holder (for typist). Miscellaneous office supplies. /s/ John T. Rowlett / John T. Rowlett, May 7, 1958 Among the records of the partnership was the following informal inventory of the office furniture and equipment originally owned by Rowlett and prepared by him: Office Furniture Located in Room 211,
Masonic Building, Shawnee, Okla.
Original
Item No.
Article Description
Cost
Remarks
1
1 each, executive desk, Doten-Duton
$ 797.74
2
1 each, telephone stand, Doten-Duton
included w/item
No. 1
3
1 each, bookcase, Doten-Duton
503.37
4
2 each, filing cabinets w/locks, Globe-Wernicke, 4 drawer,
walnut finish, legal
281.52
5
1 each, filing cabinet w/lock, Globe-Wernicke, 4 drawer,
walnut finish, letter
127.00
6
2 each, waste basket, metal, walnut finish
included w/item
No. 15
7
2 each, desk pad, brown leather
included w/item
Nos. 1 and 15
8
1 each, executive posture chair, red leather and cord,
Gunlocke
306.00 $69
1 each, executive chair, red leather, Gunlocke
255.00
10
3 each, arm chairs, red leather, Gunlocke
504.90
11
1 each, air conditioner, 1 ton, Frigidaire
350.00
12
1 set, drapes, lined, over two windows w/cornice
75.00
13
2 each, ash trays, desk type, walnut w/amber glass insert
7.65
14
1 each, ash trays, floor type, walnut w/amber glass insert
24.50
15
1 each, secretary desk, walnut
300.00
16
1 each, secretary posture chair, red leather and cord,
marble
included w/item
No. 15
17
1 16 Ft. carpet, wall to wall, cotton beige, w/double pad
275.00
18
2 each, chair decks, rubber
18.36
19
1 each, pencil sharpener, Dexter model B
7.50
SUB + TOTAL FURNITURE
$3,833.54
20
1 each, printing calculator, Underwood Sunstrand, model
10140 pc., Ser. No. 766110
563.76
21
1 each, electric typewriter, IBM Exec., 16inch carriage, mod-
ern type, #31 keyboard, 88 characters, auto. underscore
667.44
22
1 each, line-a-time, Remington-Rand model 112
42.40
SUB + TOTAL EQUIPMENT
$1,273.60
GRAND TOTAL
$5,107.14
*177 Also, among the records of the partnership were original invoices or correspondence substantiating the original cost of many of the items appearing in the informal inventory. All of the items listed in the inventory were included in the bill of sale which also included the items "Floor fan," "Maps," and "Miscellaneous office supplies" which did not appear in the inventory. Petitioner sold the drapes, carpet and air conditioner in 1958 for $110. In 1958 or 1959 he sold the file cabinets for $125. In 1959 he sold the I.B.M. typewriter, the printing calculator and the Remington copy holder for a total price of $1,000. The remaining items included in the bill of sale were sold on petitioner's account by the Western Bank & Office Supply Co. of Oklahoma City for an amount (net to him) of $500, which amount was remitted to him in 1961. In connection with the dissolution of the partnership, Rowlett gave to petitioner a check dated May 7, 1958, payable to petitioner in the amount of $1,000, with the understanding that petitioner would not present it for payment until 1959. Under date of July 25, 1958, Rowlett wrote to petitioner the following letter: Mr. Max Riley, Oklahoma City, *178 Oklahoma
Dear Max: With reference to my check for $1000.00 dated May 7, 1958, in your possession, this will confirm our agreement to the effect that I expect to notify you shortly after the first of 1959 that you may deposit the check for payment. Under date of October 3, 1958, Rowlett mailed to petitioner the following postcard: Dear Max, After we moved to the hotel in Shawnee, we decided rather hurriedly to drive up to Alaska for a look-see, and once here we decided to stay. We have been on the move for about six weeks, and are just now settled down with an address. I am becoming established here as an Independent Consultant. Under date of March 12, 1959, petitioner wrote to Rowlett the following letter: Mr. John T. Rowlett, 713 Northward Building, Fairbanks, Alaska
Dear John, I am writing to ask if you can inform me when I may deposit your check for payment. I could use it handily right now. The petroleum industry may perk up after the mandatory controls are effective. I hope so. It hasn't cleared the slump period yet. Write and tell us all about Alaska. Hello to Betty and Sally. Under date of October 14, 1961, petitioner wrote to Rowlett the following letter: *179 Mr. John Rowlett, 713 Northward Building, Fairbanks, Alaska
Dear John, This is to remind you and also a request that you pay the $1000 due me, which was payable in the first part of 1959. The last communication I had from you was in October, 1958 and I have received no answer to my subsequent letters to you. I must hear from you on the above payment or I must put the matter in the hands of an agent. In September 1962, petitioner attempted unsuccessfully to collect on Rowlett's check by depositing it in his personal bank account. Under date of November 11, 1962, petitioner wrote to Rowlett the following letter which was sent by registered mail with return receipt requested: Dear John, Will you please tell me what plans you have for reimbursing the $1,000.00 you borrowed from me? I will expect to hear from you within the next thirty days. Such receipt was mailed by Rowlett to petitioner on November 16, 1958, from Fairbanks, Alaska. Under date of December 9, 1962, Rowlett wrote to petitioner the following letter: Dear Max, I am sorry that I was not here when your letter arrived; but I am even sorrier that so far I have been unable to repay the loan to you. In *180 spite of the problems we have had since our arrival in Alaska, it is still my intent to honor the loan, and to repay it to you in its entirety. I cannot do this now, or even a portion of it. We have suffered quite a few financial reverses during the period involved; but at the moment, there is every indication that our situation will improve during the coming year. When we first arrived here, our car was stolen, and we have never been able to replace it. Then the whole state was strike-bound for an extended period of time, which resulted in a general shutdown lasting more than 18 months. The resultant drain on general business is still being felt throughout the entire state, since many firms were unable to survive. During the first period, I myself suffered a loss of roughly $3000 in uncollectible fees from a local general contractor for special liason [liaison] work performed over an extended period of time. There was nothing I could do about it; but the blow was almost more than I could take. Oil of course is what I am here for, but it has been slow getting under way in this area. I have had extremely attractive tentative commitments lined up; but they all must wait until *181 our local development gets started. In the meantime, I have done the best I can with occasional short term odd projects which have hardly netted the bare necessities. We were even unable to keep up the small payments for storage of our household effects in Shawnee; and we finally lost everything, including my audio system which alone was worth more than six thousand dollars. In addition to this, medical and hospitol [hospital] expenses for my family were quite heavy for a while, which of course has further damaged my own financial position. I am not trying to write a sob story here. I have a good deal of faith in this state, and I have made myself a recognized authority regarding some aspects of its potential development. During the past few months, several oil companies have taken significant steps toward local development; and as a result it now appears that my own groundwork may soon begin to pay off. I hope so; because I do want to take care of your loan in its entirety as soon as I possibly can. Under date of June 25, 1963, petitioner wrote to Rowlett the following letter: Dear John, I wish you nothing but the best in becoming expert upon Alaska resources. *182 Will you please forward evicence [evidence] as to when you will pay the full amount due me? This may seem abrupt, but the date by which you were to repay me the $1,000.00 is now several years past. I have obligations which are steadily increasing with my daughter going to college. I have a very definite need for the money at this time. Thereafter there was no correspondence about the matter between petitioner and Rowlett. Petitioner discussed the matter of collecting his claim from Rowlett with an attorney who advised against bringing any suit thereon because of the possibility of a counteraction and because any action would not be "economically feasible." Opinion KERN, Judge: The first issue herein involves the deductibility in 1961 of a loss resulting from the sale of furniture and equipment acquired by petitioner in 1958 as a result of the formation and dissolution of a partnership in that year, all as set forth in our Findings of Fact. A considerable number of the items included in the furniture and fixtures acquired by petitioner had been sold by him in prior years but petitioner deferred the deduction of any loss until 1961 in which year petitioner contends that *183 the remaining property was disposed of. Respondent correctly points out that this treatment of the transaction by petitioner was erroneous. As we said in Nathan Blum, 5 T.C. 702 at page 709: It is now well settled that where property is acquired as a whole, for a lump sum, and subsequently disposed of a portion at a time, there must be an allocation of the cost or other basis over the several units (except where apportionment would be wholly impracticable) and gain or loss computed and reported upon the disposition of each part. * * * Respondent argues that petitioner is not entitled to any loss deduction in 1961 arising from the sale of the remaining items of furniture and equipment in that year because of petitioners' failure to "allocate any portion of their basis to the property sold in 1958 and 1959" and their failure to "report the 1958 and 1959 sales on their joint federal income tax returns for those years * * *." If this is construed as an argument that we are precluded from an attempt to give a correct treatment in 1961 to the loss resulting from the sales of the items of property made in that year solely on account of petitioners' failure to properrly *184 report the sales made in prior years, this argument is rejected. A more serious argument is suggested by respondent on brief. This is to the effect that petitioner has failed to adduce evidence by which his basis of the entire property may be equitably apportioned among the several parts (See section 1.61-6(a), Income Tax Regs.) and therefore has failed to prove his basis of the several parts disposed of in 1961. Petitioner appears to argue that the full loss from the disposition of all the property should be recognized in 1961 since an allocation of basis among the several items of the property is impracticable. Accordingly, he does not advance, even in the alternative, any theory of allocation. However, the petitioner has introduced in evidence an informal inventory taken from the records of the partnership which shows the original cost of practically all of the several items of the furniture and equipment acquired by him upon the dissolution of the partnership. It seems obvious to us that by the use of this inventory an equitable allocation of basis may be made by taking as his basis in each individual item received upon dissolution of the partnership *185 that proportion of the original cost of such item which his total contributions to the partnership (the basis of his interest in the partnership) bears to the total original cost of all of the items as set out in the inventory. The use of this method of allocation may not result in absolute accuracy since the furniture and equipment acquired by petitioner by the bill of sale executed upon the dissolution of the partnership included three items (a "Floor fan," "Maps," and "Miscellaneous office supplies") not included in the informal inventory. However, it is our opinion that the allocation which may thus be made is sufficiently accurate to dispose of the issue involving petitioner's loss in 1961. The evidence herein shows that the basis of petitioner's interest in the partnership was at least $3,250. The total original cost to Rowlett of all of the items (except three) covered by the bill of sale was a little over $5,000. The evidence is not clear with regard to the proper characterization of petitioner's payment of $1,000 on April 10, 1958, to Kenneth E. Bovee Company. Only two facts may be taken as established by petitioner's rather confused testimony with regard thereto: that the *186 payment was made at the request of Rowlett and that the payee was not a creditor of the partnership. He was not able to give an explanation as to why the payment was made. His testimony with regard to the "loan" to Rowlett evidenced by Rowlett's check to him dated May 7, 1958, in the amount of $1,000 was not convincing. This testimony was to the effect that at the time of the dissolution of the partnership. Rowlett told petitioner he needed some money, and petitioner loaned him $1,000. At this time petitioner knew that Rowlett had been using the $2,500 payments made by petitioner on account of the furniture and equipment for his personal living expenses and that Rowlett's credit was not good. He also testified that at that time "ill feeling" existed between him and Rowlett. Respondent suggests that Rowlett's check for $1,000 given to petitioner at the time of the dissolution of the partnership might have been in payment of a personal obligation arising by reason of petitioner's payment on April 10, 1958, of a debt of Rowlett to Kenneth E. Bovee Company in the same amount. In any event, it is our opinion that petitioner has failed to prove that his payment of $1,000 to Kenneth E. Bovee *187 Company constituted a contribution to the partnership or was a part of the cost basis of his partnership interest. Petitioner has also testified in a confused and unconvincing way about other unspecified contributions made by him to the partnership, but there is no corroboration, either in writing or otherwise, of these other contributions. Accordingly, we have concluded from the record before us in this proceeding that the basis of petitioner's interest in the partnership was $3,250. We know, and have found as facts, what items of furniture and fixtures were sold by petitioner prior to 1961. We are satisfied that the remainder of the furniture and fixtures was disposed of in 1961. Applying the method of allocation discussed above and subtracting the cost basis thus approximated of the items sold in 1958 and 1959 from the total basis of all the furniture and equipment, it is apparent that petitioner's basis in the property disposed of in 1961 was an amount not less than $1,500. We therefore conclude that petitioners are entitled to the loss deduction claimed by them in 1961 in the amount of $1,000. It is noted that a loss carryover is claimed by petitioners in their amended return *188 for 1963. This is predicated on petitioner's contention that the full loss sustained upon the sale of all the items of property is to be recognized in 1961, a position which we hold to be untenable, and the contention that the basis of petitioner's interest in the partnership was in excess of $3,250. It also assumes that no part of the loss carryover was availed of in 1962, upon which we have no testimony. Petitioner made no point of this loss carryover to 1963 at the trial or on brief. However, since it remains technically an issue herein, we express the view that petitioner has failed to prove that the basis of his interest in the partnership was in excess of $3,250 and that any part of the alleged loss carryover was not availed of in 1962. With regard to the issue involving the bad debt deduction claimed in the amended return for 1963, we conclude on the record before us that petitioners have failed to prove that any debt became worthless within the taxable year. Decision will be entered under Rule 50. Footnotes
1. The return mistakenly shows the year as "1960."↩